UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | DOCKET NO. 2:23-cr-00027-NT |
| | ) | |
| TYSON DYER | ) | |
| | ) | |

**REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

NOW COMES Defendant Tyson Dyer, by and through counsel, and respectfully submits this Reply in support of his Motion to Dismiss (ECF No. 61). The Government's Response in Opposition (ECF No. 72) can generally be distilled to two arguments: First, that as a felon, Mr. Dyer is not among "the people" the Second Amendment protects and thus cannot bring an as-applied challenge. Second, even if among "the people," the Government argues, there is sufficient historical tradition of analogous firearm/ammunition disarmament to render its prosecution of Mr. Dyer, constitutional. For the reasons outlined below, the Defense respectfully contends the Government has not met their burden. Thus, the indictment against Mr. Dyer must be dismissed.

**I.    Mr. Dyer is Among "the People" the Second Amendment Protects and May Assert an As-Applied Challenge.**

In *Bruen* the Supreme Court unequivocally rejected the two step means- ends test that had been adopted by many circuits post-*Heller*. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2126-27 (2022). Yet, in its Opposition, the Government invites this Court to insert a second step in the analysis by first deciding, whether a person is a "law abiding" or "responsible" citizen, i.e., one of "the people." *See* Gov't Opp. at 7-22. It argues that the Second Amendment's reference to "the people" refers not to the American people, but rather, "members of the political community" from which our Nation has a long history and tradition of excluding certain classes

1

of individuals. *Id*. at 16-19. The Government cites to repeated references by the Supreme Court in both *Heller*[1] and in *Bruen* to "law abiding citizens" to support its proposition that their holding extended to only to law-abiding citizenry. *Id.* at 8-9, 20-21.

The nearly identical argument was made by the Government, and squarely rejected, by a Court in this District just this month. In *United States v. Levasseur*, Judge Walker cogently reasoned that, as "the people" appears throughout the Constitution and the Bill of Rights, and as felons have never been excluded from protections under these other provisions (i.e., the Fourth Amendment), adopting the Government's interpretation would result in an inconsistent reading. No. 1:22-cr-00155-LEW, 2023 U.S. Dist. LEXIS 182480, *7 (D. Me. Oct. 13, 2023). Judge Walker found the Government's interpretation was further undermined by the Supreme Court's express observation in *Heller* that "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not to an unspecified subset" and as such, there is a "strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans*." *Id*., at *5-6 (emphasis added) (citing *Range v. AG United States*, 69 F.4th 96, 101 (3rd Cir. 2023) and *Heller*, 554 U.S. at 580-81).[2]

Finally, as explained by an en banc panel of the Third Circuit in *Range v. AG United States*, given the sheer breadth of modern American criminal law, the language "law-abiding, responsible

---

[1] *District of Columbia v. Heller*, 554 U.S. 570 (2008).
[2] In *Levasseur*, Judge Walker also rejected the Government's argument – also made here (*see* Gov't Opp. at 6-7) – that, the First Circuit opinions in *United States v. Booker*, and *United States v. Torres-Rosario*, foreclosed as-applied challenges to § 922(g)(1). *Levasseur*, 2023 U.S. Dist. LEXIS 182480, **9-10. As explained by Judge Walker, with respect to *Booker*, as the defendant brought a facial challenge to § 922(g)(1), the First Circuit's decision is best understood as a rejection of a facial challenge but does not foreclose as-applied ones. *Id.* at *10. As to *Torres-Rosario*, as the First Circuit engaged in an analysis of the defendant's underlying conviction, rather than reject, it appeared to implicitly approve of an as-applied challenge, further undermining the Government's argument. *Id.*

citizen" is "as expansive as it is vague." *Range* 69 F.4th at 102. "Law-abiding, responsible citizen" could be interpreted to divest anyone who at some point transgressed the law – whether through a violent felony or minor traffic infraction – from their protection as a member of "the people." *Id*. at 102 ("Who are "law-abiding" citizens in this context? Does it exclude those who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine? …In our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be a "responsible' citizen."); *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023) ("Under the Government's reading, Congress could remove "unordinary" or "irresponsible" or "non-law-abiding" people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections."). Even if just limited to felony offenses, the definition of what qualifies as a felony today is dramatically different than at the time of the Founding. *Range* 69 F.4th at 102. As such, the interpretation offered by the Government would impermissibly vest complete power to define the contours of what individuals are afforded the protection of "the people" into the hands of the legislators. "Such extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label. And that deference would contravene *Heller's* reasoning that the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id*. at 102-03 (internal citations omitted)

Just as Mr. Dyer maintains his Fourth Amendment rights, he is plainly not disqualified from membership and protection of the "the people" solely on the basis of his status as a felon. Thus, the Second Amendment presumptively protects his possession of a firearm.

## II. The Government Has Not Met Its Burden in Establishing a Historical Tradition of Disarming Felons.

Unable to locate any Founding-era law disarming felons, in its Opposition, the Government attempts to validate § 922(g)(1) through two ways: first by analogizing prohibitions on felons possessing firearms with historical laws that restricted persecuted groups, such as minorities, and groups with opposing political views, from bearing arms. Gov't Opp. at 23-23. And second, by pointing to historical punishment of felons with death or dispossession of their property - if Founding-era law permitted the Government to take life and property, so too, it must have contemplated firearm disarmament. *Id*. at 33-36.

With respect to the first argument, it is of course, ironic that the Government is attempting to justify a modern prohibition on a constitutional right by citing historical acts of discrimination that, by modern standards, are abhorrent and unconstitutional.[3] However, the Government urges the Court to see historical analogy, because at the time of the Founding, like felons, it also feared members of these targeted groups. Gov't Opp. at 32-33. But "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Bruen*, 142 S. Ct. at 2133. And in this case, the Government paints history with too broad a brush. Moreover, its analysis ignores that these Founding-era laws were not geared towards fear of general public order offenses, but rather narrowly targeted to suppress political opponents and those they viewed may pose a threat to

---

[3] *But see* Emma Luttrell Shreefter, *Federal Felon-in-Possession Gun Laws: Criminalizing A Status, Disparately Affecting Black Defendants, and Continuing the Nation's Centuries-Old Methods to Disarm Black Communities,* 21 CUNY L. Rev. 143, 175 (2018) ("'Felon in possession' laws . . . are disparately enforced against Black defendants, and federal initiatives that charge offenders in the federal rather than state system target Black communities."); David E. Patton, *Criminal Justice Reform and Guns: The Irresistible Movement Meets the Immovable Object,* 69 Emory L.J. 1011, 1015, 1021-32 (2020) (collecting critiques of federal gun possession prosecutions, "including stark racial disparity, contribution to mass incarceration, harm to principles of federalism, diminished civil liberties, and lack of effectiveness"); *see also* Benjamin Levin, *Guns and Drugs,* 84 Fordham L. Rev. 2173, 2194 (2016) ("while fewer published studies focus on the racial dynamics of criminal gun law, the evidence that we do have suggests that people of color bear the brunt of enforcement.").

institutions of governance. *Levasseur*, 2023 U.S. Dist. LEXIS 182480 at *18; *Range*, 69 F.4th 96 at 105 ("That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be far too broad.") (Internal citations omitted).

The Government's second argument – that because at the Founding felons could be lawfully executed, the Founders must also have contemplated disarmament – also fails. Whereas historically only a small number of the most serious crimes were felonies, the Government's argument ignores the shear breadth of § 922(g)(1), which extends to any felony punishable by a year or more incarceration. *Levasseur*, 2023 U.S. Dist. LEXIS 182480 at *19.[4] Further, as explained by the Third Circuit in *Range*, just because Founding-era governments could have punished certain offenses with death, does not show a firmly rooted history and tradition of disarmament – an entirely distinct punishment. *Range*, 69 F.4th 96 at 105. Moreover, "[t]he greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.*

As demonstrated by both parties' briefings, felony level offenses existed during the Founding-era. Laws prohibiting certain persons from possessing firearms were enacted, albeit not for purposes of crime prevention. Laws prohibiting nonviolent felons from possessing firearms did not exist. Therefore, the Government's attempt to demonstrate, by analogy, that modern laws are consistent with the history and traditions of the nation must fail. *Bruen*, 142 S. Ct. at 2133. In other words, the Government has failed to demonstrate a categorical prohibition on felons possessing firearms is consistent with the history and tradition of firearms regulation.

---

[4] It also ignores that a death sentence for most of these offenses would plainly be unconstitutional today. *See Kennedy v. Louisiana,* 554 U.S. 407, 420 (2007).

### III. The Government Has Failed to Show its Prosecution of Mr. Dyer is Constitutional.

As Mr. Dyer explained in his Motion, the burden is on the Government to establish a historical "tradition"—a robust record of regulations demonstrating an accepted and enduring restriction on the Second Amendment right. *e.g., Bruen*, 142 S. Ct at 2156 (demanding a "broad tradition," not "outlier" regulations); *Id*. at 2130 n. 6 (noting that in our adversarial system, judges should follow the "principal of party presentation" thus relying on the record compiled by the parties in deciding the case). And in the final six pages of its Response, the Government appears finally to turn to Mr. Dyer and his conviction. *See* Gov't Opp. at 37-42.

However, while tacitly acknowledging its prosecution rests on non-violent felony offense[s], (*see* Gov't Opp. at 38) the Government offers no "relevantly similar" regulations. It instead cites back to its previous historical examples "discussed above" as "analogous enough." Gov't Opp. at 39.[5] However, as also discussed above, laws targeted to disarm suspected political traitors or targeted minorities that the Government feared might rebel are not analogous to laws aimed to generalized public harm - such as trafficking in intoxicants or prior weapon possession. *See United States v. Daniels*, 77 F.4th 337, 354-55 (5th Cir. 2023) (noting that "even as the Founders were disarming Catholics and politically disaffected citizens, they left ordinary drunkards unregulated.").

The defense, however, does acknowledge that in *Levasseur*, Judge Walker found disarming an individual convicted of felony drug possession to be constitutional. *Levasseur*, 2023 U.S. Dist.

---

[5] The Government also points to the administrative challenge of adopting an as-applied fact-specific approach. *Id*. at 36. However, as explained by Judge Walker in *Levasseur*, given the rights at stake, this argument is unavailing. *Levassuer*, 2023 U.S. Dist. LEXIS 182480 at *20 ("The Government understandably wishes to extinguish the prospect of felon-by-felon challenges to lifetime disarmament, which is why its arguments amount to a Venn diagram with categorical treatment of felons at its core. While the desire for office efficiency is an understandable impulse, expediency should not be confused with constitutional fidelity based on the plain historical record."

LEXIS 182480 at *26. Specifically, Judge Walker found a sufficient history to support disarming "dangerous" individuals and that as the "dangerous connection between illegal drugs and firearms is well-known and has been recognized by Congress" Mr. Levasseur could be lawfully prohibited. *Id*. Mr. Dyer respectfully submits this final conclusion in *Levasseur* is in error. Moreover, in applying its articulated "dangerousness" framework, rather than look to relevantly similar historical regulation, the Court instead appeared to return to a needs-balancing test including deferring to legislative determinations of dangerousness – a type of review expressly foreclosed by *Bruen*.[6] *Daniels*, 77 F.4th at 353 (citing *Bruen*, 142 S. Ct. at 2127, 2129) ("[W]e cannot inspect a legislature's judgment of dangerousness using traditional standards of scrutiny. *Bruen* forbids us from balancing a law's justifications against the burden it places on rightsholders.").

Mr. Dyer respectfully contends that the Fifth Circuit decision in *United States v. Daniels*, offers an instructive alternative framework:

> To remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead of a general notion of "dangerousness." The government must show that a historical danger-based disarmament is analogous to the challenged regulation. We must use *Bruen's* "why" and "how" analysis to assess whether the Founding-era restriction is relevantly similar to the modern one. We must ask: Why was the group considered dangerous at the Founding and therefore disarmed? And why does the modern law classify a person as presumptively dangerous? Is the comparison supported by the record? Furthermore, how did the historical regulation limit the rights of the dangerous class? And how does the modern regulation do so?

*Id*. at 354. In this case, aside from laws barring individuals believed to pose a threat to the Government, the Government here identifies no class of persons who were "dangerous" and disarmed for reasons analogous to Mr. Dyer. As the Government has proffered no other facts to support an individualized determination that Mr. Dyer was sufficiently dangerous to justify his disarmament, they have not met their burden. Thus, the indictment must be dismissed.

---

[6] In articulating this framework, the Court appeared to rely in part on Justice Barrett's 2019 dissenting opinion in *Kanter v. Barr*, 919 F.3d 437, 462 (7th Cir. 2019), which predated *Bruen*.

WHEREFORE, for the foregoing reasons, Mr. Dyer respectfully request this Court grant his Motion to Dismiss the Indictment.

Dated this 27th day of October 2023 at Portland, Maine.

Respectfully submitted,

*/s/ Grainne Dunne*

---
Grainne Dunne
*Attorney for Defendant*
HALLETT WHIPPLE WEYRENS
6 City Center, Suite 208
P.O. Box 7508
Portland, Maine 04112-7508
PH: 207-775-4255
*gdunne@hww.law*

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CERTIFICATE OF SERVICE

I, **Grainne Dunne**, attorney for **Tyson Dyer** hereby certify that I have served electronically, a copy of this motion upon **Assistant United States Attorney Jonathan Nathans, Esq.**, via the ECF system.

Dated: October 27, 2023 /s/ *Grainne Dunne*

Counsel for the Defendant